```
 1                    UNITED STATES DISTRICT COURT

 2                    MIDDLE DISTRICT OF FLORIDA

 3                        ORLANDO DIVISION

 4

 5   UNITED STATES OF AMERICA,   )
                                 )
 6                 Plaintiff,    )
                                 )
 7   vs.                         )  Case Number
                                 )  6:17-CR-159-ORL-40DCI
 8   MEINRAD KOPP,               )
                                 )
 9                 Defendant.    )
     _____)

10

11          WEDNESDAY, DECEMBER 13, 2017; 2:34 P.M.
                    SENTENCING HEARING
12          BEFORE THE HONORABLE PAUL G. BYRON
                 UNITED STATES DISTRICT JUDGE
13

14   GOVERNMENT COUNSEL:
      Ilianys Rivera, AUSA
15

16   DEFENSE COUNSEL:
      Bijan Parwaresch, Esq.
17

18

19

20

21

22

23
     _____
24
     *Proceedings recorded by mechanical stenography
25    Transcript produced with computer-aided transcription*
```

1                          I N D E X

2

3    Guideline calculations...8

4

5    DR. JEFFREY A. DANZIGER

6    Direct examination.......13

7    Cross examination........28

8

9    Defense argument.........35

10

11   Government argument......45

12

13   Defense rebuttal........52

14

15   Defendant's statement....54

16

17   The Court................55
       (addresses defendant)
18

19
     Sentence pronounced......68
20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  United States of

 3    America versus Meinrad Kopp, case number

 4    6:17-CR-159-Orlando-40DCI.  For the government.

 5              MS. RIVERA:  Good afternoon, Your Honor.

 6    On behalf of the government, Assistant United States

 7    Attorney, Ilianys Rivera.  Here with me is Homeland

 8    Security Investigations Special Agent Jacqueline Acosta.

 9    I apologize, because Task Force Officer Michael

10    Spadafora, he's the case agent as well, he wished to be

11    here, but he recently had surgery, and he's recovering

12    from surgery.

13              THE COURT:  All right.  Thank you very much.

14    Good afternoon.

15              THE COURTROOM DEPUTY:  And for the defense.

16              MR. PARWARESCH:  Good afternoon, Your Honor.

17    Bijan Parwaresch on behalf of Meinrad Kopp, who is

18    present at defense counsel table.

19              THE COURT:  Good afternoon.

20              THE COURTROOM DEPUTY:  Madam interpreter,

21    please stand and raise your right hand.

22              Do you solemnly swear or affirm, under penalty

23    of perjury, that you will justly, truly, fairly, and

24    impartially act as an interpreter in the case now before

25    the Court?
```

1            THE INTERPRETER:  I do.

2            THE COURTROOM DEPUTY:  Please state your name

3    for the record.

4            THE INTERPRETER:  Dr. Gabriele Suboch.

5            THE COURTROOM DEPUTY:  Thank you.  Please have

6    a seat.  Mr. Kopp, please stand and raise your right

7    hand.  Do you swear or affirm, under penalty of perjury,

8    that the statements you will give in these proceedings

9    will be the truth, the whole truth, and nothing but the

10   truth?

11           THE DEFENDANT:  I swear.

12           THE COURTROOM DEPUTY:  Please have a seat.

13           THE COURT:  Thank you, counsel.

14           We're here for the sentencing in this matter.

15           Mr. Kopp, on September 22nd, 2017 -- let me

16   know when you're prepared.

17           Madam interpreter, if I go too fast, just

18   raise your hand so I can slow down.

19           MR. PARWARESCH:  Your Honor, may I be heard?

20           THE COURT:  Pardon me?

21           MR. PARWARESCH:  May I be heard briefly?

22           THE COURT:  Yes.

23           MR. PARWARESCH:  With the Court's permission,

24   we would ask the Court for permission that the client

25   can talk and listen in English.  If he gets insecure in

1    something, he'll just ask the interpreter for guidance.

2              THE COURT:  So long as the interpreter is

3    available to ensure the record is clear, that's fine

4    with me.

5              MR. PARWARESCH:  Thank you, Your Honor.

6              THE COURT:  Mr. Kopp, on September 22nd, 2017,

7    you entered a plea of guilty to Count 1 of the

8    indictment, which charged you with coercion or

9    enticement of a minor to engage in sexual activity in

10   violation of Title 18 of the United States Code, Section

11   2422(B).  I previously accepted your plea of guilty and

12   adjudicated you guilty of that offense.  We're now at

13   the stage of the proceedings where I need to address

14   certain matters with you, as well as your attorney, and

15   counsel for the government.

16             Let me begin by discussing the final

17   presentence report, which appears at docket entry 50.

18   That's the report prepared by Probation that sets forth

19   the facts of the case, your personal history, the

20   guideline calculation, and the like.

21             Have you had the opportunity to discuss that

22   with your attorney to your satisfaction?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  And are there any objections to

25   the guideline application or the factual accuracy?

1           This is a comment to the defense, I apologize.

2           MR. PARWARESCH:  Your Honor, there are no

3    changes requested to -- for relevance of the guideline

4    calculations.  There are some minor additions.

5           THE COURT:  I did see that there was a

6    submission by the defense to the final presentence

7    report that appear towards the end of the final

8    presentence report dealing with matters in mitigation,

9    such as Dr. Danziger's opinions and other factual issues

10   that are also raised in your sentencing memorandum.

11           Is that what you're referring to?

12           MR. PARWARESCH:  Judge, with the Court's

13   indulgence, I could briefly go down the paragraphs.

14           THE COURT:  My point is this simply:  That

15   objections deal with the guideline calculations.

16   If there are factual disputes that you've raised to

17   Probation that do not affect the guideline calculation,

18   then your factual contentions are preserved.

19           If you'd like to address any that you believe

20   go towards the guideline calculation, you're welcome to.

21   I'm more than happy to hear you.  But it is not uncommon

22   for attorneys to want to have disagreement as to the

23   completeness or accuracy of some of the factual

24   paragraphs, and if they do not address the guideline

25   calculations we'll take those once we get through this

1    portion.  So with that clarification, if you'd like to

2    be heard now, please go right ahead.

3            MR. PARWARESCH:  Judge, none of these points

4    are relevant to the guideline calculation.  Thank you.

5            MS. RIVERA:  Your Honor, if I may just put

6    something on the record.

7            THE COURT:  Yes.

8            MS. RIVERA:  I reviewed the objections, and

9    all but one exhibit mentioned by the defense in his

10   objection, all of those exhibits have already been

11   included in the presentence investigation report.

12           Exhibit A, pertaining to the medical records,

13   that was summarized in the presentence investigation

14   report as well by the probation officer.

15           My only concern now is that some of the

16   records are revealing of information that may be private

17   and confidential of the defendant, as well as PII of

18   other individuals identified in that exhibit.  I just

19   wanted to raise that with the Court.

20           THE COURT:  When you say PII, what do you

21   mean, personal identification information?

22           MS. RIVERA:  Yes, Your Honor.  There are

23   several documents of that nature included in the

24   defendant's objections to the presentence investigation

25   report.

1          THE COURT:  Well, the defense has not moved to

2     seal any of those matters.  And if you believe that

3     there is a need to redact any of the personal

4     information contained in medical records that don't

5     pertain to the defendant, then that redaction can take

6     place.  I'll leave that up to the parties and Probation

7     to address, but there's been no motion to redact or to

8     seal.  I don't think sealing would be appropriate since

9     they're Mr. Kopp's records pertaining to his own medical

10    past.  But as to other individuals who might be named,

11    that can always be redacted from the documents that are

12    placed in the clerk's file as opposed to the file that

13    goes to the Eleventh Circuit.

14          All right.  Ms. Rivera, do you have any

15    objection to the factual accuracy or the guideline

16    calculations?

17          MS. RIVERA:  No, Your Honor.

18          THE COURT:  The guideline calculations in this

19    case is Total Offense Level 28, Criminal History

20    Category I.  That provides for an advisory range of 78

21    to 97 months.  However, there is a ten-year minimum

22    mandatory in the case making the guideline range 120

23    months.

24          The supervised release term is between five

25    years and life supervised release.  The fine is $25,000

1    to $250,000, special assessment of $100.  The statutory

2    penalty is ten years minimum to maximum life

3    imprisonment.

4            In terms of the factual accuracy of the

5    presentence report, Mr. Parwaresch, if there are any

6    factual controversies you'd like to raise, now would be

7    the time.

8            MR. PARWARESCH:  Thank you, Your Honor.

9            It is memorialized in paragraph 2 of my

10   objection that Mr. Kopp currently weighs 150 pounds, 28

11   pounds less than during initial incarceration, and that

12   is due to the fact that his diabetes is poorly managed.

13   He also is suffering from erectile dysfunction, as well

14   as an ear disease, tinnitus, as well as depression.

15           THE COURT:  Thank you very much.

16           With those additional observations I'll accept

17   the factual statements contained in the presentence

18   report as my findings of fact.

19           Let me advise the parties what I have

20   considered in preparing for the hearing today.  As is my

21   custom, I have reviewed the complaint and the affidavit

22   in support of the criminal complaint that appears at

23   docket entry number 1.

24           I've reviewed the indictment at docket entry

25   16, which allege three counts -- Count 1, using

1   interstate commerce to entice a minor into sexual

2   activity, Count 2, traveling in interstate commerce for

3   the purpose of engaging in a less than 6-year-old

4   conduct, Count 3, transportation of child pornography.

5           I reviewed the plea agreement at docket entry

6   34, wherein Mr. Kopp has pled guilty to Count 1.  There

7   is a recommendation at paragraph 7 by the government.

8   This is the issue that's presented in various motions --

9   sentencing memoranda by the government and the defense,

10   which I will speak about in a moment.

11          I have reviewed, of course, the presentence

12   report that we've been discussing at docket entry 50.

13   I've reviewed the letters that have been submitted by

14   the defense in connection with the presentence report

15   and in their mitigation submissions.

16          The letters are by the following individuals:

17   Gianna Vitali, that's G-i-a-n-n-a, V-i-t-a-l-i, an

18   associate project manager and further -- who formerly

19   had a relationship with the defendant for 20 years.

20   Astrid Frank, A-s-t-r-i-d, Frank, a pharmacist and

21   pharmacologist who has known the defendant for 20 years.

22   Christine Konig-Grossmann, last name is K-o-n-i-g,

23   hyphen, G-r-o-s-s-m-a-n-n, who is also a pharmacist and

24   has known the defendant for 35 years.  David Grossmann,

25   the defendant's godson.  Judit Grossmann, who is also

1    the daughter of the elder Grossmanns, who I've spoken

2    of.   Wolfgang Hubbauer, last name H-u-b-b-a-u-e-r, who

3    is a pharmacist who has known the defendant since their

4    days in university and, of course, the report by Dr.

5    Danziger.

6            There's a government sentencing memorandum at

7    docket entry 61.   There are objections to the

8    presentence report, the factual ones we've been

9    discussing, at docket entry 62.   Defense sentencing

10   memorandum at docket entry 63.   Defense reply to the

11   government's memorandum at docket entry 64 with

12   attachments.

13           Are there -- I've also reviewed, for the

14   record, the various e-mail exchanges between the

15   defendant and the undercover agent and the video

16   recording of the conversation that took place between

17   the defendant and the agent en route from the airport to

18   Brevard County, which was the location of where the

19   meeting was supposed to take place.

20           Are there any additional written submissions

21   that either side would like me to consider?

22           MR. PARWARESCH:   Yes, Judge.   There is a

23   psychosexual evaluation by Dr. Danziger, who is ready to

24   testify today.

25           THE COURT:   Yes.

1           I've read his report, and I'm familiar with

2    Dr. Danziger.  You can call him when you're ready.

3           Are there any other written materials?

4           MR. PARWARESCH:  Judge, there were medical

5    records and psychological records filed as well.

6           THE COURT:  Yes, that's 65-1.  That was

7    attached to your reply to the government's memorandum.

8    I have read those.

9           MR. PARWARESCH:  Thank you, Your Honor.

10          THE COURT:  Ms. Rivera, anything else you

11   would like to submit?

12          MS. RIVERA:  Nothing further, Your Honor.

13          THE COURT:  Will there be any witnesses

14   testifying for the government today?

15          MS. RIVERA:  No, Your Honor.

16          THE COURT:  Then, if you would call Dr.

17   Danziger, we can take his testimony now.

18          MR. PARWARESCH:  All right.  Respectfully,

19   Judge, there was one more item, and my client wrote a

20   letter to the Court.

21          THE COURT:  And where does that appear?

22          MR. PARWARESCH:  Let me withdraw that, Your

23   Honor, please.

24          THE COURT:  All right.  Thank you.

25          Dr. Danziger, if you'd like to come forward.

1          THE COURTROOM DEPUTY:  Sir, please come

2    forward to the witness box and remain standing.  Raise

3    your right hand.

4          Do you solemnly swear or affirm, under penalty

5    of perjury, that the testimony you shall give in this

6    cause shall be the truth, the whole truth, and nothing

7    but the truth?

8          THE WITNESS:  I do.

9          THE COURTROOM DEPUTY:  Please have a seat.

10          Please state your name, and spell your last

11   name for the record.

12          THE WITNESS:  Jeffrey A. Danziger,

13   D-a-n-z-i-g-e-r.

14          THE COURT:  Good afternoon, Doctor.  You may

15   proceed when you're ready.

16      DR. JEFFREY A. DANZIGER, DEFENDANT'S WITNESS, SWORN

17                   DIRECT EXAMINATION

18   BY MR. PARWARESCH:

19   Q    Good afternoon, Doctor.  Can you please -- I

20   understand you're familiar with the Court.  Could you

21   please briefly introduce yourself?

22   A    Yes.  I am Jeffrey Danziger.  Of course, I've

23   testified previously, Your Honor.

24   Q    And what kind of education do you have, sir?

25   A    I attended Harvard College, Cambridge, Mass,

1    graduating Magna Cum Laude with a bachelor's degree in

2    biology in 1978.  I then attended the University of

3    Miami School of Medicine receiving my M.D. in 1982.

4            I, then, went to St. Louis, Missouri to the

5    Washington University School of Medicine completing my

6    internship and residency in psychiatry in 1986.  After

7    spending one year on the faculty, I came back to my

8    native state of Florida, and I've been here now for 30

9    years.  I am board certified in psychiatry, forensic

10   psychiatry, addiction psychiatry, and geriatric

11   psychiatry, and I maintain an office practice in

12   Maitland, Florida.

13   Q    And Doctor, in the last couple of years,

14   approximately how many psychosexual evaluations have

15   you performed for the courts?

16   A    Yesterday, I did number 408.  So there's been a

17   variety of charges -- child pornography charges,

18   traveling charges, sexual battery, some people who are

19   exhibitionists and voyeurs, so a variety of offenses

20   in federal court.  Yesterday was number 408.

21           MR. PARWARESCH:  Your Honor, may I tender

22   this witness as an expert?

23           THE COURT:  Yes, you may.

24           MR. PARWARESCH:  Thank you, Judge.

25           THE COURT:  Any objection to receiving Dr.

1   Danziger as an expert?

2          MS. RIVERA:  No, Your Honor.

3          THE COURT:  He's so received.

4   BY MR. PARWARESCH:

5   Q    Doctor, did you have an opportunity to evaluate

6   Meinrad Kopp in this case?

7   A    I met with him on two occasions -- July 21, 2017,

8   and on September 2, 2017.

9   Q    And approximately how many hours did you spend with

10  him, all together?

11  A    The first meeting was four and three-quarters hours.

12  The second one, an hour and a half, so a total of six

13  hours, 15 minutes, more or less.

14  Q    And fair to say that that's a substantial amount of

15  time that is sufficient for you to come to these

16  conclusions?

17  A    In my opinion, it was a sufficient amount of time.

18  Q    Okay.  Now, Doctor, you found a few diagnoses on my

19  client, correct?

20  A    I did.

21  Q    Could you please state them to the Court?

22  A    The diagnoses that I listed, per the DSM-5, our

23  diagnostic and statistical manual:  Sexual sadism

24  disorder, pedophilic disorder, major depressive disorder

25  -- recurrent, severe.

1           And then a number of medical diagnoses, which

2    included diabetes mellitis, type 2 -- he requires

3    insulin -- hypertension, hyperlipoidemia, and there's a

4    history of TIAs and mini strokes.

5    Q    Doctor, with your permission I'll break it down into

6    a psychological and a medical part.  In reference to the

7    psychological part, are you aware that Mr. Kopp was

8    treated in 2012 for severe depression?

9    A    I don't know that it was 2012 he was treated for

10   depression.

11   Q    2015, correct?

12   A    Actually, what he told me was that there was a

13   distant history of treatment for depression with

14   antidepressants, but he did not report recent treatment

15   for depression.

16   Q    Now, how did you come to the conclusion that he is

17   suffering from severe depression?

18   A    Several factors.  First, before meeting with him on

19   July 13, 2017, while in the Orange County Jail, he made

20   a very serious suicide attempt, had to be resuscitated,

21   attempted to hang himself, nearly died, was fortunate to

22   live.  Obviously from a psychiatric standpoint that has

23   signature significance.

24          What he related to me during both meetings was

25   -- not surprisingly, given the severity of his

1   predicament -- very low mood, feelings of hopelessness,

2   future is bleak, a lack of positive emotions, disturbed

3   sleep, markedly decreased appetite, weight loss, no

4   active suicidal intent, but often thinking he'd be

5   better off dead.

6          In addition to the clinical observation, as

7   well the history of his serious suicide attempt, I

8   performed the MMPI-2RF, which is the revised formulation

9   of the broadband psychological test.  And that test was

10  consistent with an individual with significant

11  depressive symptoms -- hopelessness, helplessness,

12  previous suicide attempt, a constellation of physical

13  and psychological symptoms consistent with a

14  significantly depressed individual.

15         So with all of this data from the history, my

16  two meetings with him and the results of testing, it was

17  my opinion he met the criteria for a major depressive

18  disorder.  I called it major depressive disorder

19  recurrent, given that there was previous treatment back

20  in Europe, and I diagnosed it on the mild, moderate to

21  severe scale as severe, given the preponderance of

22  symptoms.

23  Q    And in those almost six hours, you had plenty of

24  time to ask him questions and have a direct dialogue

25  with him, correct?

1   A    I did.  Some of the six hours and change was

2   testing, but I met with him for nearly five hours the

3   first time.  I came back and visited him a second time.

4   He had some additional things he wanted to say to me.

5   I also evaluated him again in early September so, from

6   my standpoint, adequate time to assess him.

7   Q    And did he, as a matter of fact, admit things to you

8   that were not recorded or reported in the documents of

9   this crime?

10  A    He did.  He -- period.  He did.

11  Q    Please, explain to the Court.

12  A    A number of things he related to me.  He spoke of

13  physical abuse as a child at the hands of his father at

14  length, which is in the report.  He spoke of having

15  fantasies of sadomasochism dating back to the age of 12,

16  yet never acting upon them.

17       He related to me that even though his

18  communications with the undercover officer, he mentioned

19  other incidents with an 11-year-old and a 17-year-old.

20  He said that those were all feigned to make himself

21  appear more impressive and that there had never,

22  throughout his life, been anything but the fantasies.

23  He had never acted on them before this incident here.

24       He also reported to me -- and this may have

25  been in the report -- that it would not be surprising if

1   on his computer would be found images of child

2   pornography.  He openly admitted that he had viewed them

3   fairly heavily in the past six months.  And even on the

4   psychological testing said that there would be images of

5   prepubescent, pubescent teenage boys and girls, so this

6   was information that he, frankly, admitted to me rather

7   candidly.

8   Q    Is it fair to say that his main focus has been on

9   puberty rather than pre-puberty?

10  A    It would be nonexclusive.  What he related was he

11  was in a 20-year relationship with his girlfriend,

12  Gianna.  He said that it was monogamous, that they

13  occasionally, but not often, had a sexual relationship.

14  His interest was in not just in prepubescent

15  individuals, but also in teens and adults, so it was not

16  exclusive pedophilic interest, but spanned the age

17  range.

18  Q    Now, the fact that he admitted to some parts that I

19  guess was not known to the government at the time and he

20  denied other parts, would that be consistent with the

21  truth?  Would you believe that he was truthful at the

22  time?

23  A    Of course, I have to be careful opining on someone's

24  credibility, as an examiner.  But was he candid with me?

25  Did he say things that would not be favorable to him?

1   Did he speak openly about old abuse he suffered, his

2   fantasies and interests, what was likely to be found on

3   his computer?  What he said to me was certainly candid

4   and not shy.  I have to be careful about telling a court

5   I believe this or I don't believe that.  But he was --

6   he admitted many things that were not favorable.

7   Q    Let me ask it this way.  Did you felt [sic] like he

8   was holding back or that he was trying to answer your

9   questions?

10  A    He presented -- from my standpoint as an examiner,

11  not a trier of fact -- very candidly.

12  Q    Now, based on your conversations and your testing

13  with him, did you come to a conclusion as far as the

14  risk of recidivism in this case?

15  A    I did.

16  Q    And could you please tell us what tests did you

17  perform in that regard?

18  A    Well, there were a number of factors that I looked

19  at.  First, I looked at the history.  To my

20  understanding -- and I have not heard otherwise --

21  there's no previous criminal history here in the United

22  States, Germany, Switzerland, or anywhere else.  And I

23  am not aware and I have not been made aware of any

24  previous convictions for sexual offenses, any previous

25  live victims.

1            As far as I know, the date I have, this
2    situation here, although it involved a fictional victim,
3    was the first time in his 55 years of life he was
4    accused of a sexual offense.

5            He also has an above-average intelligence, a
6    good work history.  This is not someone who has a
7    history of non-sexual crimes, been in and out of prison.
8    There's not an antisocial temperament.

9            There is an actuarial instrument that we use
10   called the Static-99R.  Of course, it is always
11   difficult to predict the future with certainty.  None of
12   us can do that.  But by an actuarial instrument, what I
13   mean is that you look at data and information you have
14   and say what does that talk about someone's future risk.

15           And an example of an actuarial instrument
16   would be life insurance.  If I wanted to buy a policy --
17   61 years old, I don't smoke, and I weigh this much --
18   they might say you're likely to live 22 years.  Here's
19   your premium.  Of course, I could be hit by a bus
20   walking out of the courthouse or live to a hundred, but
21   we look at actuarial instruments to assess risk.

22           The Static-99R is a 10-item actuarial
23   instrument.  It looks at things like demographic
24   factors, such as age, whether they've lived with a lover
25   for more than two years, looks at prior criminal

1   history, sexual and non-sexual, and looks at victim

2   characteristics.  And it generates a certain amount of

3   points which then classifies the offender, compares him

4   to the universe of males convicted of a sexual offense,

5   gives an estimate as to the risk of recidivism.

6          Now, in looking at age, one of the things that

7   it looks at is the age release.  So, he's 55 years old.

8   In speaking to counsel, my understanding today, it's

9   very likely whatever the Court chooses for his release

10   date, it'll be after the age of 60.  I think it's a

11   reasonable assessment.

12          With that, his score on this instrument would

13   be a negative 2.  It's a negative 3 points if you're

14   over 60.  He lived with a lover for more than two years.

15   That's zero points.  Other factors with prior sexual

16   offenses are a zero.  Prior violent offenses, zero.

17   Prior non-contact sexual offenses, zero.

18          Even though the victim was fictional, he still

19   gains a point because the victim was not related to him.

20   But the contact was over two months, not 24 hours, and

21   the fictional victim was female.  He scores negative 2.

22          Looking at the 2016 risk categorization, for

23   someone with a score of negative 2 on release, the

24   5-year risk of recidivism is about 1.6 percent.  It's

25   fairly low.

 1          Now to be fair, there is a separate

 2   categorization in the literature for people who are

 3   considered high risk.  And so, these are people who even

 4   though their score is low, the offense might be severe

 5   or perhaps they have mental illness.  But even in that

 6   higher category with a negative 2, the 5-year recidivism

 7   risk is about five percent.  So, actuarial measures, of

 8   course, apply to a broad range of individuals.  But at

 9   least using this measure, his risk comes out as fairly

10   low.

11          We're also looking at his medical history.

12   This is someone who -- he suffers from diabetes

13   mellitus, which is not apparently very well controlled.

14   He's got hypertension, he's got high cholesterol, all of

15   which predisposes people to heart attacks and strokes.

16          We know he's already had mini strokes, which

17   are temporary strokes that remit.  A review of the

18   medical records shows there's some occlusions in the

19   vertebral artery, which is one of the arteries that

20   supplies the back portion of the brain.  If that gets

21   further occluded, he's at risk.

22          So looking at all of these factors, including

23   both the medical and the historical, even though the

24   allegations here -- well, can be considered disturbing

25   and frightening, nevertheless, looking at this, his past

1    history, the absence of prior offenses, the absence of

2    an antisocial temperament and an actuarial measure, and

3    particularly age and medical issues, the risk is, in my

4    opinion, on the low side, whenever the Court allows him

5    to ultimately be released.

6    Q    Doctor, you also performed the Abel test?

7    A    I did.

8    Q    And what did you learn?

9    A    The Abel test is a comprehensive measure to assess

10   people's sexual interest.  It has two parts.  The first

11   part is a lengthy questionnaire that obtains detailed

12   information about an individual's sexual history and

13   sexual attitudes, and on that measure he was rather

14   candid.

15        He admitted to interest in sadomasochism.

16   He admitted to viewing pornography, both child and

17   adult, and admitted to fantasies about teenagers and

18   sadomasochism.  So again, at least on this measure, he's

19   responding to the computer, but he was not shy at all in

20   revealing things.

21        In fact, there's a measure on the instrument

22   called the social desirability scale.  And that measures

23   a person's reluctance to admit to common flaws, such as

24   impatience or feelings of anger.  And he actually scored

25   low on that suggesting he responded to the test items in

1    a straightforward and truthful fashion.  So he was

2    rather frank on this part of the test admitting to

3    things that he had done.

4         The second part of the test has the examinee

5    view non-pornographic images of men and women, boys and

6    girls, of different ages and races and, in a manner

7    beyond the examinee's conscious awareness, it can

8    provide an objective amount of interest in these groups.

9    It's about 85 percent specific, 85 percent sensitive,

10   meaning it gets it right about five out of six times.

11        And interestingly, looking at that, his only

12   areas of sexual interest were in adult females and

13   post-pubescent adolescent females.  And sexual interest

14   in post-pubescent adolescents, of course, it's a serious

15   legal and boundary violation, if acted upon, but it's

16   where our mid brains are wired.  It's not a sign of

17   sexual deviation, if not acted on.  And he, at least on

18   this test, did not show interest in prepubescent girls

19   and showed no interest in boys.

20        Looking at other measures, he did show

21   interest in sadomasochism with adult white females.

22   But other sexual paraphilias -- sadomasochism with

23   males, fetishism -- that was not elevated.  So the

24   testing, to a large extent, was consistent with what he

25   related to me clinically and what he reported.

1    Q    Doctor, considering you're a medical doctor, briefly

2    about the medical situation.  So is it fair to say that

3    there's a difficulty for blood and oxygen to get to his

4    brain, at least the back part of his brain?

5    A    Well, what we know is that he has three illnesses --

6    high blood pressure, diabetes, and elevated cholesterol.

7    All of these diseases damage the lining of arteries.

8    The arteries can become clogged, occluded, which is a

9    blockage, and then sometimes little pieces of the plaque

10   break off, form an embolus that can travel and do

11   damage.  That's how you get strokes.  That's how you get

12   heart attacks.

13        So with those diseases alone, he is at

14   heightened risk.  I understand he has a family history

15   of early death, which is another risk factor.  And he's

16   already had TIAs, which are mini strokes.  What makes it

17   a TIA is that you have stroke-like neurologic symptoms,

18   but the symptoms disappear in less than 24 hours, so --

19   but that certainly places you at greater risk.

20        Also from recent records I received, there's

21   a blockage in the vertebral artery, which is an artery

22   that supplies blood to the back portion of the brain.

23   So should that become further occluded, that could

24   represent problems.

25        Again, I'm not a cardiologist or neurologist,

1     but as a physician, he has many risk factors for

2     strokes, heart attacks, and early death.

3     Q     Doctor, considering his psychological as well as

4     medical situation, is there a great chance that he's

5     going to outlive even a ten-year sentence?

6     A     It's hard to predict life expectancy.  Again, this

7     goes to actuarial.  Again, given his medical problems

8     and particularly if they are not aggressively cared for,

9     if his sugar levels, cholesterol, hypertension are not

10    rigorously controlled, the risk of early death is

11    heightened.  As far as an exact date, can't predict

12    that.

13              MR. PARWARESCH:  Your Honor, may I have a

14    moment?

15              THE COURT:  Yes, you may.

16              MR. PARWARESCH:  Thank you, Your Honor.

17         (Pause in proceedings.)

18              Thank you very much, Doctor.

19              Thank you, Your Honor.

20              THE COURT:  Thank you.

21              Any questions, Ms. Rivera?

22              MS. RIVERA:  Yes, Your Honor.

23              THE WITNESS:  Ms. Rivera, good afternoon.

24              MS. RIVERA:  Good afternoon to you as well.

25    /////

1                         CROSS EXAMINATION

2     BY MS. RIVERA:

3     Q    Sir, what independent sources of information did

4     you verify before conducting your evaluation of the

5     defendant?

6     A    Well, I had --

7     Q    Did -- I'm sorry to interrupt you.  Did you review

8     any of the evidence in the government's case?

9     A    Yes, I did.  I didn't bring the binder here, but I

10    was given a binder by Mr. Lindsey who originally

11    retained me, and that had the report from the FBI

12    special agent.  It had photographs of what he brought.

13    It had all of the text messages.  So it was a very large

14    binder.  I called it, in my report, investigative

15    reports and collateral documentation.  I summarized it,

16    but I read through all of that.

17    Q    Did you review the chats, then, between the

18    defendant and the undercover agent, all of them?

19    A    I did.  And if you look at the top of page 2, I

20    summarized that in one paragraph, the general content

21    of them.

22    Q    Did you also review the recordings of the

23    defendant's confession in this case?

24    A    I did not hear the recording, so I didn't get an

25    audio of it.

1    Q    And did you get to review the audio of the

2    defendant's recording once he arrived to Orlando at the

3    Orlando International Airport?

4    A    I have not heard the audio, but I am aware of the

5    general content of the conversation and why he said he

6    was there.  I believe the gist of that is contained in

7    the investigative reports.

8    Q    Now, let me ask you, in reaching your conclusions

9    regarding the defendant's risk of recidivism, did you

10   give him credit when he said that he -- that basically

11   this was all pretty much a fantasy of his?

12   A    I considered that.  Of course, the issue of

13   credibility is outside my area.  As noted before, he was

14   revealing about other things.  What would or wouldn't

15   have happened, I don't know.  I can't say.  But tending

16   to look at this in an actuarial fashion, his history,

17   and even the Static-99R, even though the victim was

18   fictional and there was no live victim, it still counts.

19          Looking at all the factors -- looking at his

20   age and medical history, the absence of prior criminal

21   convictions -- I would still opine, particularly

22   regarding his age and medical history, the risk is

23   relatively lower than if he was a 20-year-old with a

24   serious history of criminal behavior.

25   Q    So you did credit, then -- you did give credit to

1   his allegation that he was not intending to follow

2   through with having sexual intercourse with a minor?

3   A    No.  It doesn't matter, but --

4   Q    And did you credit his statement that he did not --

5   you state that he doesn't have a previous history of

6   convictions or criminal history.  However, in the case

7   there appears to be evidence that he did sexually abuse

8   minors in the past.  Did you credit his allegation that

9   he did not abuse an 11-year-old child in the past?

10  A    If it could be shown that there was a live victim,

11  would that change the equation?  Yes, it would.

12  Q    Okay.

13  A    But my understanding is there is no evidence to

14  show.  No one's come forward.  I'm not aware of any

15  convictions in Europe, or even allegations or

16  investigations.  But if there were live victims, could

17  that change the equation?  Yes.

18  Q    Did you then also give him credit -- did you credit

19  his statement that he was -- that he also pretty much

20  alleged that it was a fantasy or that he feigned that he

21  was going to sexually abuse a 17-year-old by giving her

22  a sexual beating?

23  A    Once again, the issue of whether there is such a

24  17-year-old or not, I don't know.  So if it could be

25  shown that that was true, that some communications are

1  found, that some arrangements were made, that there was

2  a live victim or live victims, I would agree,

3  Ms. Rivera, that would change the equation.  But at this

4  point, I'm not aware that any data to support that

5  exists, and again as far as his credibility, I don't

6  know.

7  Q    The reason why I ask this question is because you

8  seem to give credit to a lot of what he says in your

9  assessment.  However, in certain areas where it's

10  troublesome, right, you don't -- you give credit to

11  other allegations of his, which are not consistent with

12  the evidence.  Do you understand why I'm -- why I asked

13  the question?

14  A    Well -- and I understand, but I'm not sure what's

15  inconsistent with the evidence.  And the reason is --

16  and I'm not trying to split hairs -- if it was shown

17  that there were investigations in Europe for live

18  victims or he had been convicted of such offenses or

19  there were -- he had been fired from jobs because of

20  misbehavior, if there was some tangible data, then that

21  would change the equation.  As it stands now, we don't

22  know is that true or was this things that he was saying

23  to make himself -- puff him up and make him look more

24  credible as part of a fantasy to the undercover officer.

25  We don't know.

1   Q    Wouldn't you consider that part of this

2   corroborative information may be your own diagnosis that

3   he suffers sexual sadism and that he's a pedophile?

4   A    In looking at the DSM-5 criteria, it allows for

5   either fantasies or behavior.  So if you never engage in

6   sadomasochistic acts, but you fantasize about it or

7   watch images of it and it leads to some interference in

8   functioning -- it affects your job, your marriage, maybe

9   get arrested for something -- then it's a diagnosis.

10  So you don't need to carry out the act to make the DSM-5

11  diagnosis.

12  Q    My question goes to your diagnosis seems to

13  corroborate that his allegations that he had sexually

14  abused an 11-year-old and that he was intending to

15  follow through in this case -- in this case, he traveled

16  from abroad to sexually molest a minor, that those --

17  that your diagnosis would tend to corroborate those

18  allegations?

19  A    Maybe, yes.  Maybe, no.  The diagnosis is based on

20  his report of interest in sadomasochism back to age 12,

21  participating in chat rooms, fantasizing and thinking

22  about it.  Similarly, the pedophilic disorder diagnosis

23  is based on the child pornography that he openly

24  admitted to me.  So you can make the diagnosis without

25  crossing the line to a live victim.

1    Q    Were you aware that the defendant, in his audio

2    recording, indicated that he has been viewing child

3    pornography for the past 30 years?

4    A    I don't recall the 30 years.  He had told me he'd

5    been doing it for awhile and more recently, but I wasn't

6    -- I don't recall the 30-year.

7    Q    Are you aware that authorities in Switzerland found

8    about 137,000 images of child abuse and other depictions

9    of violence in his computer?

10             MR. PARWARESCH:  Objection to that number,

11   Judge.  That evidence was --

12             MS. RIVERA:  That evidence was shared with the

13   defense, Your Honor.

14             THE COURT:  Pardon me -- objection as to the

15   volume or the fact that it exists?

16             MR. PARWARESCH:  Yes, Judge.

17             First of all, the defense had no opportunity

18   to cross examine these materials in any which way.  I

19   cannot see whether there were any search warrant issued

20   for the search of the computer.  I don't know what the

21   standard in Switzerland is for child pornography.

22   Secondly, I have no access to any documents.  And my

23   understanding is that it was a much lower number than

24   what the prosecutor just said relating to children, so

25   that's why I'm objecting, Your Honor.

1          THE COURT:  All right.  Perhaps you can

2     rephrase the question a little bit more generally and

3     then we'll talk about whatever they may have found in

4     Switzerland when you get to the aggravation and

5     mitigation part of the hearing.

6     BY MS. RIVERA:

7     Q    I just wanted to inquire whether you're aware of

8     any findings by the Switzerland authorities as to any

9     findings of child pornography on his home computer?

10    A    I heard about that recently from counsel that there

11    were findings by the Swiss authorities.  I'll note it's

12    not surprising since he openly told me, during our first

13    meeting, that anyone who looked in his computer

14    forensically would be likely to find child pornographic

15    images.  If there is a very large number, that might be

16    surprising.  He did not quantify, but the fact that they

17    are there is not at all surprising to me.

18          MS. RIVERA:  Your Honor, we have no further

19    questions.

20          THE COURT:  Thank you.  Any redirect?

21          MR. PARWARESCH:  One moment, Your Honor.

22       (Pause in proceedings.)

23          No further questions, Your Honor.  Thank you.

24          THE COURT:  Thank you.

25          Thank you, Doctor.

1              THE WITNESS:  Thank you, Your Honor.

2              THE COURT:  Pleasure to see you, as always.

3              Any additional witnesses?

4              MR. PARWARESCH:  No witnesses, Your Honor.

5              THE COURT:  I'm prepared to hear argument.

6              My practice is to have the defense make their

7    arguments and then I'll hear from the government and

8    then Mr. Kopp can make the final statement, if he

9    chooses.

10             MR. PARWARESCH:  Very well, Your Honor.

11             THE COURT:  I have read your sentencing

12   memorandum, as I've indicated, along with the letters

13   that were submitted.  I've read Dr. Danziger's report

14   which appears at the end of the presentence report and

15   the medical records at 64-1.

16             MR. PARWARESCH:  Thank you, Judge.

17             We're advocating for a ten-year sentence in

18   this case, Judge.  The defense believes that this

19   sentence is sufficient, but not greater than all the

20   considerations in 18 USC, 3553.

21             Your Honor, Mr. Kopp clearly understands the

22   seriousness of the offense.  And how do we know that?

23   We know that initially the way he responded during the

24   arrest.  Immediately, he cooperated with law

25   enforcement.

1          Immediately, he answered all their questions,

2    if not even volunteering information.  We also know that

3    he tried to take his life.  We also know that he has a

4    long history of depression.

5          Judge, when looking at Mr. Kopp, there's no

6    doubt that the five weeks leading up to the arrest here

7    were the worst in his life.  But there's also no doubt,

8    Your Honor, that 55 years in his life were lived

9    exemplary before.  And before any of these allegations,

10   I can report to the Court that Mr. Kopp had not only

11   assisted many of his friends and family members, but his

12   work, not only in the way he treated his co-workers, but

13   also in the greater purpose of his work, which was

14   developing lifesaving medications.

15         It becomes very clear when the Court takes a

16   look at the life that he lived, the job that he held,

17   the work he did for humanity with the drugs that he

18   helped develop that helped millions of people in this

19   world, that certainly he has a lot of positive things in

20   his life.

21         There is a core to his character with a desire

22   to help others.  He's got very close relationships to

23   friends and family members.  He accepted responsibility.

24   He showed remorse.  We know that he showed remorse from

25   the letter from his 20-year-old partner, from a friend

1   that he communicated and wrote to with the last name of

2   Frank.  We also know it from the way he conducted

3   himself to the officers, that he immediately cooperated,

4   as well as the suicide attempt.

5        When looking at a sentence in this case, Your

6   Honor, we're asking the Court to look at the low risk of

7   recidivism in this case, as well as the detrimental

8   health of the client.  A review of the case law

9   reflects, of course, with some exceptions, but that the

10  general tendency in these kinds of enticement cases when

11  two conditions are met, meaning a fictional victim, as

12  well as no communications between the defendant and

13  anyone but government agents.  Many of the courts

14  sentence these cases around the ten-year mark.

15       When looking at the offense conduct, Your

16  Honor, we have to note that not only did he take

17  responsibility, but we have to also look at how we got

18  to this point.  And it is without hesitation that the

19  Court can, of course, find that this case would not have

20  happened had the undercover agent not made this

21  advertising and had not been in these encouraging

22  communications with him.  Now, Mr. Kopp takes full

23  responsibility for his actions, and I think his remorse

24  that he has shown throughout the case further underline

25  the responsibility that he's taking.

1          Nonetheless, it's also clear to the

2    communications with the agents that at its inception

3    they were originated by the agent.  During the

4    communications, it is also clear that the degree of

5    criminality throughout the conversation increases.

6          We're not trying to argue that it's the fault

7    of the agent here that we got to this extreme conduct,

8    but certainly a close review of the evidence shows that

9    numerous times the agent asked, what else do you want to

10   do?  What else do you want to do?

11         And certainly, whenever Mr. Kopp mentioned

12   something, there was an encouraging response which

13   increased the severity of the communication from the

14   beginning to the end.  We also like to point out that

15   Mr. Kopp simply responded to a fabricated advertisement.

16   He agreed to all the rules and terms set by the

17   undercover agent.

18         Your Honor, you have already mentioned the

19   letters that the family members wrote, but especially in

20   a case with the accusation as in this case, these

21   letters carry a significant amount of weight.

22         As this Court has seen many times when

23   defendants come on these kinds of charges before the

24   Court, there are no family members around and there are

25   no letters that can be found.  But here, Mr. Kopp has

1    the support from his 20-year long life partner, and

2    there are a few things that are very important, I

3    believe.

4            One is that she also underlines that Mr. Kopp

5    is suffering deep regret for his actions, and she is

6    outlining her extreme surprise to the allegations in

7    this case.  A man that she knows for more than 20 years,

8    has always been kind to her, has always been correct in

9    society, has dedicated his life to his patients and his

10   work and worked tirelessly seven days a week to make

11   humankind healthier.

12           You also had the opportunity to review a

13   letter from his 20-year-old professional and private

14   friend, former co-worker.  She stated to the Court that

15   when she observed him supervising 250 employees, he was

16   always respectful, he was attentive, he was

17   kind-hearted.  He always helped others with their

18   careers and their private life.  He secured his

19   employees.  He gave them food.  He took care of them.

20           Further, Your Honor, you reviewed the letter

21   from Ms. Grossmann, who knows Mr. Kopp for 35 years.

22   Not only did she write to the Court, but also her two

23   children, a boy and a girl, now a man and a woman, who

24   knew Mr. Kopp for a long time.  They all describe him as

25   candid, honest, caring, present.  He even was selected

1    by Ms. Grossmann to be the godfather of her son, and

2    Mr. David Grossmann described to the Court what a

3    positive relationship he had with the defendant.

4         The same positive feelings are echoed in his

5    sister's statement, by Judit Grossmann.  And then, of

6    course, Judge, there is the letter from Mr. Hubbauer,

7    a friend of 20 years who, again, describes Mr. Kopp as a

8    peaceful, peace-loving, down to earth and honest person.

9         Your Honor, you already heard the expert

10   testify and there can be no doubt as to the

11   psychological and medical situation that my client finds

12   himself before the Court today.  Psychologically, there

13   can be no doubt that he had a rough upbringing.  Up to

14   the age of 16, his life was described by terror and

15   violence.  His mother was not able to get medical

16   treatment because of the father terrorizing the family

17   and also died at young age.

18        When looking at the medical factors -- I'm

19   sorry -- let me also, in reference to the psychological,

20   mention the fact that we have provided to the Court the

21   2015 medical records from a Swiss psychologist, who

22   clearly diagnosed the client as being majorly depressed

23   and suffering from that illness.

24        Now, looking at his medical situation, I think

25   the doctor described it best, and it's not very good,

1    Judge.  It's -- at best, he is a ticking time bomb.

2         He already had strokes.  He has an artery

3    that's not supplying him enough blood and oxygen, and he

4    had episodes based on that.  He's got all the risk

5    factors that anybody suffering from stroke could have.

6    They were all listed by the doctor.

7         And looking at the problem of the stroke and

8    the artery in the brain, in combination with the other

9    risk factors, I submit to the Court that even a ten-year

10   sentence amounts to a life sentence for my client.

11        Your Honor, he finds himself before this Court

12   without any criminal history.  We understand there was

13   some pictures found in a computer in Switzerland.  I

14   have to ask the Court to disregard that evidence in its

15   entirety based on the fact, certainly, that that

16   evidence in itself is not a crime in the United States

17   and the computer is not the jurisdiction of the United

18   States, the computer was not inside the United States.

19   There have been no evidence or allegations made that

20   there was any connection to any victim or recordings of

21   the United States, and certainly defense counsel did not

22   have an opportunity to cross examine any of these

23   materials.

24        Of course, I'm not talking about the images

25   themselves, but the way law enforcement got to them --

1    access, due diligence, whether they pulled these

2    pictures from the hard drive or from some kind of a

3    remote storage -- I have no way of fact checking any of

4    this.  And based on that, I would ask the Court to

5    disregard that evidence.  But if the Court does consider

6    this evidence, I would say that it does not come as a

7    surprise to this Court, because the doctor had already

8    digested this information and had already basically made

9    the record open for the Court.

10          Your Honor, I cannot say enough about my

11   client's employment history.  As a criminal defense

12   lawyer, we represent people from all kinds of life.

13   And I can tell this Court that a gentleman like him,

14   who worked almost 20 years helping, developing

15   lifesaving medications, we have proof.

16          Mr. Kopp was inherently involved in the

17   development of a medication by the name of Keytruda.

18   This is a cancer medication that helped millions of

19   people.  It's in the market in many countries in this

20   world, and it has saved millions of lives.

21          He is 55 years old at the moment.  And he

22   would be released, even if the Court would consider the

23   lowest sentence of ten years, at age of 65.  The Court

24   looked at the analysis of the chance of him reoffending,

25   in combination of his medical problems.

1           I would also suggest to the Court that the

2   abuse by his father, the rough upbringing, the immediate

3   acceptance, as well as the remorse are very important

4   facts.

5           Mr. Kopp finds himself also facing additional

6   collateral consequences of the sentencing and

7   incarceration, some of which people with families in the

8   United States would not be suffering from.

9           And first of all, I think the record is clear

10  that he has been suffering severe personal and

11  professional mental stress.  This is supported by the

12  2015 psychological reports, as well as the doctor's

13  report here today, as well as his suicide attempt.

14          Your Honor, this was not a suicide attempt

15  where somebody tried to take a scissors and cut

16  themselves half an inch and have a little bleeding like

17  this Court sees this many times.  This was serious,

18  Your Honor.  They had to intervene.  Without

19  intervention, he was dead already.

20          Now, his reputation, privately and

21  professionally, have been destroyed.  He had outstanding

22  employment with Merck.  That has been terminated.

23          Your Honor, based on the fact that my client

24  has severe medical conditions, he is taking a host of

25  medications that were outlined in my brief.  I think

1    it's more than eight serious medications.

2           I'm asking the Court to consider a placement

3    in a medical facility.  That would also aid him in

4    receiving sex offender treatment and any psychological

5    treatment that is required.  We would submit to the

6    Court, based on the risk factors, that FMC Butner would

7    be an appropriate facility.

8           Your Honor, I also would like to point out

9    that after talking to my client in length, he explained

10   to me that although his alcohol use in the past was

11   correctly reflected in the statements in the PSI -- the

12   weeks prior to leading up to this case, he was drinking

13   between two and three glasses of red wine, which is

14   consistent with statements he had made before, just the

15   amount's a little bit more -- I would submit to the

16   Court that based on the statement previously that he

17   would benefit from a drug and alcohol program.

18          In conclusion, Your Honor, I cannot highlight

19   enough, especially in an offense like this, and I think

20   it ties in directly to the chance of reoffending, is his

21   immediate remorse and acceptance of responsibility.

22   There was no downplay.  This defendant admitted to these

23   allegations in the car at roadside.  I can report to the

24   Court that he feels deeply ashamed and humiliated.

25          We've seen his lifetime of accomplishments and

1    we know that he is facing five weeks of bad decisions,

2    bad decisions he made, that he understands, versus 55

3    years of being a productive member and really helping

4    humankind.  He does have a strong family support, even

5    through these types of allegations.  And we submit to

6    the Court that he will not be a danger to the community

7    at age of 65 with his medical situation.

8              Thank you very much, Your Honor.

9              THE COURT:  Thank you.  Ms. Rivera.

10             MS. RIVERA:  Yes, Your Honor.

11             I would submit to the Court, Your Honor, that

12   these were not just five weeks of bad decisions.  The

13   evidence in this case admittedly -- and I am crediting

14   the defendant with the incriminating statements he made

15   in this case throughout, because we cannot selectively

16   choose what to credit him for.

17             Like, he has given us a lot of information in

18   the presentence investigation report that has not been

19   verified, but deemed credible by his experts, by his

20   attorney, and probably by the Court.  Well, the evidence

21   in this case corroborates the fact that this defendant,

22   for at least 30 years, has been viewing and downloading

23   child pornography.  He admitted that much to the agent

24   during the interview.  But it is not correct to say that

25   this case had not happened had it not been for the agent

1   who posted the ad.  You cannot say that and also allege

2   the defendant is claiming full responsibility for his

3   conduct and that he is deeply remorseful when he's

4   talking to the expert and saying, well, this was all a

5   fantasy.  I never intended to follow through.

6          When his own expert confronted him, well, you

7   traveled with these items that appear to be a torture

8   kit -- rope and tape and other items.  It is obvious

9   that he intended to follow through, but he was -- it has

10  been really hard for him to come to terms with the

11  egregious nature of his conduct.

12         It is not as if the agent had posted an ad on

13  Craigslist, like many of my other cases.  This is not

14  your run-of-the-mill enticement case.  This defendant

15  used the dark web.  And that leads me to believe that he

16  was being really sophisticated about the means which he

17  chose to commit the offense because we all know that by

18  using the dark web, his communications are encrypted.

19  Had it not been because the officer had gained access to

20  this chat room -- this particular chat room where the

21  defendant met Agent Spadafora was a chat room dedicated

22  to individuals sexually interested in children.  And I

23  saw the chats.  These were provided to the defense.

24         When you look at this chat room, individuals

25  are advertising specifically for children very openly.

1   It's not the type of coded language that you see in some

2   of these other websites like Craigslist, for example,

3   which are -- they're used for -- for purposes that are

4   not nefarious so individuals typically use some coded

5   language.  No, these are very overt communications in

6   the dark web about individuals being sexually interested

7   in a certain age range.  Well, that's how he met Agent

8   Spadafora.  And it was not Agent Spadafora who was

9   feeding him the lines of what to do with the minor.

10          The communications are very clear.  It was --

11  those were his words when he said that he wanted to

12  treat the child like a dog, when he said that he wanted

13  to stretch her vagina.  He gave so many graphic details.

14  I have not had an enticement case with such graphic and

15  -- and just nefarious intent of causing harm and

16  inflicting pain on a child, and that worries me.

17          And my concern or my standpoint here is that

18  a sentence of 20 years is justified because this is

19  actually outside most of our enticement cases where

20  individuals are not expressing a desire to humiliate,

21  to cause pain to a child.  He was actually suggesting to

22  the father that they needed to choke the child, stuff

23  her mouth to silence her while he was sexually

24  assaulting her.

25          And I believe because of the nature of the

1      conduct, what he was intending to do is so egregious

2      that a higher sentence is justified not in order to

3      punish him, but to deter others and to protect the

4      community from future crimes of the defendant.

5              I've had defendants in other cases with

6      significant medical history, and they are -- they're

7      committing these types of crimes at age 65, at age 73.

8      We have not -- we don't know for certainty how long he's

9      going to live, but as long as he lives with the

10     diagnosis provided by his own expert, he is a risk to

11     children in our community.

12             The reason why I submitted, Your Honor, the

13     recording of the defendant when he arrived at the

14     airport and met with Agent Spadafora in the car is

15     because the Court can assess his demeanor, and his words

16     actually show that he intended to follow through with

17     what he had expressed, and not only as to the notional

18     minor in this case, but he also talks about the

19     11-year-old.  And he gestured.  He used his hand to show

20     the agent how he had used the belt to beat this

21     11-year-old over her vaginal region and how that was

22     even better than sex because of how much satisfaction he

23     gets from inflicting pain on a child.

24             I suggest to the Court that there is credible

25     evidence that he, indeed, sexually assaulted an

1    11-year-old and that he had the purpose of assaulting a

2    17-year-old.  He described he was going to give her some

3    kind of a sexual beating.  All of those statements, Your

4    Honor, I believe, are corroborated by the fact that in

5    this case he traveled all the way from Germany -- I'm

6    sorry -- from Switzerland to New Jersey and then to

7    Orlando to follow through with his criminal purpose.

8          During his post-arrest interview, he says --

9    he said that he's always lived in these fantasies for

10    the past 30 years and that he satisfies those fantasies

11    by viewing child pornography and masturbating to those

12    images and that he has downloaded a number of images and

13    videos.  We don't have to go to Switzerland or the

14    evidence that was seized by the authorities to know that

15    this is true.

16          In our case, we have evidence that he

17    distributed child pornography to the undercover agent,

18    and he went even further than that.  He described

19    exactly what he was viewing.  The agent received those

20    links that gave him access to videos depicting children

21    between 6 and 12 years of age engaged in sexually

22    explicit conduct.  That was part of the evidence in this

23    case.  The government is moving to dismiss that Count,

24    but that is relevant evidence that shows that he

25    intended to follow through with his criminal purpose and

1    he asked the father, the agent, to show those videos to

2    the minor.

3              There is also evidence that he did intend to

4    make contact with the minor throughout the chats.  He

5    talked to an agent who was acting as an undercover

6    agent.  She was portraying the notional minor when they

7    were on their way to the house.  And so there is

8    evidence, overwhelming evidence, that the defendant had

9    the intent to follow through, that he has been sexually

10   interested in years -- in children for many, many years.

11             He was found to be a sadist, a pedophile.

12   I believe, based on the evidence, that he is a sexual

13   predator.  He needs mental health treatment and sex

14   offender treatment.  He's obviously a risk to children

15   in our community.  And he should be separated from

16   children for a very long time to ensure that he is

17   given, hopefully, the proper tools to deal with his

18   compulsive attraction -- with his compulsive sadistic

19   and pedophilic interest, and that's why we're

20   recommending a sentence of 20 years with a life term of

21   supervised release.

22             This is a defendant who, beyond his sexual

23   interest in children, found a very sophisticated way to

24   commit his crimes.  He was living this double life.

25   He fooled his friends and relatives to believing that he

1    was -- that he was a good -- a good person.

2          And I understand that he did probably do very

3    good things in his career, but this conduct, what he was

4    doing using the dark web, it's just beyond horrific and

5    a very serious crime for which he deserves to be

6    punished.

7          We have asked, Your Honor, for a fine of

8    $250,000, and I believe based on his finances, it's

9    justified.  We don't have a full count of his financial

10   situation, because he breached the plea agreement by not

11   providing a financial affidavit.

12         He would -- he refused to answer any questions

13   posed by the probation officer regarding his assets.

14   And I think this should actually be used by the Court

15   against him.  It should weigh against him in actually

16   determining what is a fair fine in this case.  I think

17   the maximum fine of $250,000 is justified based on his

18   net worth, and this is only based on his report of $3.5

19   million.

20         He is -- he's not married.  He has no

21   dependents.  There is no actual victim in this case

22   seeking restitution.  As to the count involving the

23   transportation of child pornography, Your Honor, there

24   were two minor victims identified.  They are Russian.

25   But they did not complete a notification reference

1    report; therefore, we cannot notify them, that they are

2    victims in this case, but there are real victims in this

3    case, except that we don't have a restitution request.

4    And we believe, Your Honor, therefore, that this fine

5    of $250,000 is justified so that we can, Your Honor,

6    make sure that the combined sentence is fair and just in

7    this case, Your Honor, and that's basically a summary of

8    our argument.

9            THE COURT:  Thank you, ma'am.

10           MR. PARWARESCH:  Very briefly, Your Honor,

11   may I?

12           THE COURT:  Yes, very briefly.

13           MR. PARWARESCH:  Thank you, Your Honor.

14           Your Honor, I'd just like to clarify that my

15   client did not travel from Switzerland.  He had business

16   to attend to in New Jersey, and he went from New Jersey.

17           THE COURT:  Yes, he had a conference in New

18   Jersey, and then came down here from the conference.

19           MR. PARWARESCH:  Very well, Judge, thank you.

20           And in reference to the -- immediately

21   addressing the communications with the agent, Judge,

22   I thought I was very careful in making it clear to the

23   Court that what we're arguing is not that the crime

24   happened because of the agent.  We're not.

25           But when we take a look at the -- as the

1    government says -- serious facts in this case, and some

2    of them were outlined, that to get to this extreme

3    point, it was a back and forth between the agent.  So

4    we're not saying that he's innocent.  He's taken full

5    responsibility for his actions, but some of these

6    extreme facts certainly would not have ever been

7    discussed unless they would have been that long back and

8    forth.  And additionally, I'd also like just for the

9    Court to be clear -- and I'm sure you are -- that he did

10   not send any pictures of himself.

11             THE COURT:  Right.

12             MR. PARWARESCH:  He did not send any actual

13   pictures.  What he actually sent was a link.  So we

14   don't know what pictures actually ultimately he

15   downloaded.  Thank you, Your Honor, for your time.

16             THE COURT:  Thank you.

17             Mr. Parwaresch, your client has the right to

18   make a statement.  If you choose to do so, now would be

19   the time.

20             MR. PARWARESCH:  Judge, may I add one more

21   point?  I apologize.

22             THE COURT:  Yes, go right ahead.

23             MR. PARWARESCH:  I just wanted the Court to

24   know that he's not a citizen of the United States and he

25   doesn't have any legal business in the United States or

1    connection other than what he did for work earlier,

2    which he doesn't any more, so he would be automatically

3    deportable based on the conviction of his offense.

4            THE COURT:  Yes.

5            MR. PARWARESCH:  Thank you, Your Honor.

6            THE COURT:  Thank you.

7            MR. PARWARESCH:  Your Honor, would you like

8    him to speak from the podium?

9            THE COURT:  He can stay where he is.

10           That's fine, Mr. Kopp.

11           THE DEFENDANT:  Honorable Judge Byron, thank

12   you for allowing me to first and foremost express my

13   sincere and utmost regrets towards the crime that I have

14   committed and the harm that I have caused.  I am very

15   remorseful about anything that I have done in this

16   crime, and I acknowledge that it was terribly wrong.

17           I have broken the law, I acted against moral

18   and humanity, and I -- excuse me -- and I have sinned

19   against God.  A take full responsibility for my

20   wrongdoing, and I ask for forgiveness and mercy.

21           During the time of incarceration, my eyes have

22   been opened and I have realized how wrong it was, what I

23   have done.  I feel ashamed and sorrowful.  I deeply

24   regret and express my most sincere apologies.

25           If God -- through grace -- give me a life

1   after my sentence, I want to live humbly, quietly, and

2   faithfully as a Christian in a Christian community.

3   God bless you.

4           THE COURT:  Thank you, Mr. Kopp.

5           MR. PARWARESCH:  Thank you, Your Honor.

6           THE COURT:  Mr. Kopp, there are a number of

7   factors I need to consider in imposing a sentence in

8   this case, and the lawyers have been speaking about it

9   this afternoon, as well as discussing it in the various

10  sentencing memoranda that I've read.

11          As I have indicated, I've read all the

12  documents that have been submitted.  I take that

13  responsibility very seriously.  Every case that I

14  sentence is an individual case.  I try not to categorize

15  or create an approach to sentencings that is less than

16  individualized and personal.  I think it is a very

17  personal decision.  It's a very individualized decision.

18          There are sentencing factors I have to

19  consider in 18 USC, Section 3553, and that's the federal

20  statute that sets forth a number of factors for

21  sentencing judges to consider, including the nature and

22  circumstances of this offense, your criminal history or

23  the lack of one, and the need for the sentence to

24  reflect the seriousness of the offense, promote respect

25  for the law, provide just punishment for the offense.

1          The sentence must also provide adequate

2     deterrence to future criminal conduct by you and others

3     who become aware of the sentence.   I must protect the

4     public from further harm, and provide you with any

5     needed educational/vocational training, medical care or

6     correctional treatment.

7          I also must consider the types of sentences

8     that are available to me in making my selection.   And in

9     the end, I am directed to impose a sentence that is

10    sufficient, but not greater than necessary to comply

11    with the sentencing factors that I have just identified

12    for you.

13         The starting point in all of these discussions

14    are the Sentencing Guidelines, and they are no longer

15    binding, as you well know, but they start as a starting

16    point for judges.   And I am mindful of the fact that the

17    Sentencing Guidelines here are Level 28, Criminal

18    History Category I, which provides a sentencing range

19    that's below the minimum mandatory.

20         Congress, in its wisdom, however, has decided

21    that a sentencing range can be quite a bit more varied

22    than what the guidelines may provide.   Congress, for

23    this type of offense, has determined -- and I believe

24    correctly -- that a ten-year minimum sentence is

25    required in all cases and the maximum sentence can reach

1    as high as life imprisonment, depending on the nature
2    and circumstances of the offense.  In terms of avoiding
3    disparity in sentencing, I'm also aware of the fact that
4    judges can vary in the manner in which they sentence
5    these cases.
6            I can tell you, I have sentenced -- I can't
7    actually conceive of anyone I've sentenced to ten years
8    in this type of case, so far.  I will tell you I've had
9    child pornography cases where the sentences are far
10   greater than the guidelines provided for enticement of
11   a minor.  I think that's more of a flaw with the
12   guidelines for child pornography than anything else.
13   But I have had cases where I determine that the
14   individual has a desire to inflict harm upon a child as
15   the most serious offense that I see, or one of the most
16   serious offenses I have seen.
17           In this case, there are a number of factors I
18   have to take into consideration, and let me start with
19   your personal characteristics.  I am aware of the fact
20   that you have a distinguished career in terms of your
21   work in the pharmacological field, that you're highly
22   educated.  I'm aware of the fact that your childhood
23   began with your mother, unfortunately, passing away
24   while you were at a young age and your father --
25   according to your statements -- being abusive in his

1    treatment towards you as well as to your mother during

2    her life.

3         I take into my consideration Dr. Danziger's

4    statements.  He is a well-recognized and well-respected

5    psychiatrist who deals in these areas, and he has

6    prepared a detailed report that I reviewed and, for

7    example, as Dr. Danziger correctly noted, your prior

8    mental health history is fairly limited.

9         And I'm not saying this to suggest that your

10   counsel was attempting to mislead Dr. Danziger.  These

11   cases are fact-intensive and you can easily misspeak.

12   There were other medical involvements between you and

13   your attending Swiss physician in a time frame that's

14   consistent with the questions asked.

15        But I would note, for the record, at page 4 of

16   Dr. Danziger's report, which is found at docket entry 50

17   at the end of the presentence report that you had

18   reported that you had never been hospitalized in a

19   psychiatric facility.  At page 5, Dr. Danziger reports

20   that you denied a history of manic or hypomanic

21   episodes, denied any such episodes lasting greater than

22   four days, that while you did visit a Swiss

23   psychiatrist, you did so on three or four occasions and

24   otherwise were never treated by a mental health

25   professional.

1          I did review the results of the MMPI and the

2    Abel Assessment.  I'm very familiar with the Abel

3    Assessment and what it measures.  I appreciate Dr.

4    Danziger's assessment of the risk for recidivism, and he

5    is quite right in saying it's a benchmark.  There's no

6    way to predict with absolute certainty what a person

7    will do in terms of recidivism, but his risk factor for

8    you is relatively low, no higher than five percent.

9          Your physical health.  You have a number of

10   ailments, more severe than is typical for a person your

11   age, but I'm mindful of the fact that you've had TIAs or

12   mini strokes.  I am well aware of what those are.  You

13   take a number of medications, and all of these impact

14   potentially life expectancy.

15         I'm also aware of the fact you pled guilty to

16   the offense with which you're charged, Count 1, which is

17   the agreement with the government.  You were cooperative

18   post-arrest.  You are obviously remorseful since you did

19   attempt suicide while in custody.  You have a history

20   somewhat of depression, and that's been documented.

21   And I have read carefully the letters submitted by the

22   people who have known you throughout your lifetime.

23         I am less moved by the idea that it's a

24   notional victim, and I will explain why.  Certainly, a

25   victim who is personally injured is a unique and tragic

1    event, and a child being harmed is a uniquely horrific

2    event.   In these kinds of undercover operations,

3    however, the only person who doesn't know that the

4    victim is fictional is the perpetrator.   That is, you.

5    In your mind, throughout all your conversations, this

6    was a real person.   You were shown a photograph from one

7    of the police officers when she was younger to depict a

8    child.   You commented upon your satisfaction with the

9    way she looked.

10          You also spoke on the phone on the way to

11   Brevard County with this notional child, the officer

12   posing as a child, and were quite excited by that

13   conversation, because I did watch the videotape taking

14   place in the police car.   And so, the idea that this is

15   a notional victim and, therefore, that is somehow

16   categorically less important or less serious, I reject

17   that argument.   But for excellent police work, there

18   would have been a victim, and so I really do discount

19   that argument.

20          In terms of the level of encouragement by law

21   enforcement, I do appreciate your attorney's point.

22   He's not suggesting you were entrapped or you were

23   battered into or berated into any of these discussions,

24   but I will tell you that when I read the reports, the

25   chronology matters.   Timing and sequencing always

1    matters when it comes to the mental intent of a person

2    and their intent to follow through on the acts, because

3    some people do engage in role play or fictionalized

4    behavior.

5              And if you look at the government's sentencing

6    memorandum, the very first attachment is a

7    communication, April 26th, 2017.  And what happened, as

8    has been noted by Ms. Rivera, is the undercover officer

9    had access to the dark web, not a public chat room, but

10   a place that you would have to know to go and find,

11   which indicates familiarity and a prior experience in

12   this regard.  And he posted a message advertising that

13   his notional 13-year-old child was available sexually.

14   And you responded within moments, literally moments, to

15   the posting.  It wasn't days.  It wasn't there for a

16   week.  It didn't have to get refreshed.  It was right

17   away.

18             And the conversation went immediately to what

19   sexual activity the father is engaging in with this

20   child.  He explained it.  And as Ms. Rivera indicates,

21   that's because this particular chat room was designed

22   for people who are not shy about having these

23   discussions.

24             And after you established the age of the

25   child, which you asked, and indicated it was a great

```
 1    age, you asked the notional father if he was having

 2    intercourse with this child.  I'll spare the ladies in

 3    the room the rough language that was used, but it's

 4    reflected in the e-mail or the chat, whatever the proper

 5    terminology is.  And then you expressed your

 6    satisfaction that the father was going to share the

 7    child, asked how many people have had sex with her

 8    before you.  The father, an undercover agent, indicates

 9    five and you were very pleased by that response.

10          The conversation quickly turned within this

11    very first discussion to whether or not the child would

12    be available for domination.  And you asked right away

13    whether we're talking about S and M, sadomasochism, or

14    humiliation.  The officer says yeah.  And your response

15    is, wow, I guess I just won the lottery in finding you,

16    and it accelerates from here.  Every conversation that

17    goes forward becomes more graphic.  In fact, in this

18    particular very first conversation, you made it very

19    clear that you intended to abuse and misuse this child

20    in very graphic terminology, which the record reflects

21    very clearly from those statements.

22          The discussions go on back and forth over

23    about a two-month period, in part, because you were

24    traveling to other locations, which you discussed with

25    the notional father and, in part, because you were
```

1  getting your affairs in order to come here for other

2  work purposes and then make your trip down from New

3  Jersey to Florida to meet.

4          In your various conversations -- and I'll

5  summarize the points that are, I believe, the most

6  aggravating -- you described your desire to slap this

7  child in her face, on her breast, her vagina.  You

8  expressed the desire to have forcible sex with her.

9  You expressed a desire to insert objects into her

10  vagina, to inflict pain upon her, to cause her to

11  experience bondage, including being handcuffed and tied

12  up.  You expressed a desire to treat her like a slave.

13  You expressed desire to take her to a store where she

14  would have to pick out the dog leash and collar that she

15  would wear.  You expressed a desire to do other things

16  to her that would inflict pain.  And when the father

17  talked about whether she would scream, you said, "Great,

18  she'll scream."  "She will suffer some pain."

19          When the discussion turns towards other

20  painful acts, your response was, "That's the fun part

21  for me, she'll cry."  You suggested group sex with the

22  child.  This went on and on.  You discussed taking

23  photographs, whether the father would take photographs.

24  The list of abuse and of deviant interests that you

25  wanted to inflict upon this child are innumerable.

1          I'm aware of Dr. Danziger's assessment that

2    you are diagnosed with sexual sadism disorder,

3    pedophilic disorder, major depressive order, recurrent

4    and severe.  I appreciate the reason for Dr. Danziger

5    sharing this that explain some of the statements you may

6    have made, but it also, as Ms. Rivera points out, causes

7    great concern of the risk that you present upon release

8    from incarceration.

9          When I watched the videotape in the car, I --

10   you were a little hesitant at first, but within a fairly

11   short period of time, you -- after speaking with the

12   child, in particular, on the phone who is allegedly

13   making dinner for you, the conversation turned back

14   towards the various atrocious things that you intended

15   to perform and inflict upon this child.  You did not

16   appear to be somebody engaged in fantasy or role play,

17   and I'll tell you why I believe that.

18         Number one, your familiarity with the dark

19   web.  Number two, your comments which were very

20   specific, detailed, and graphic.  Number three, you were

21   shown a photograph of the child, and that did not deter

22   you.  Number four, in the car, you actually flew from

23   New Jersey to meet this father, got in the car and

24   discussed with him your plans.

25         You spoke with the notional child on the phone

1   so you were aware that there was, in fact, a person you

2   were meeting and, which has been alluded to by

3   Ms. Rivera, is the items that you brought with you.

4   You brought a suitcase that contained a number of

5   devices that were designed to hurt the child, including

6   a rope and tape, weights, a bottle brush, flashlight,

7   clamps and weights that you intended to affix to her

8   vagina, and you even described the two types of clamps

9   you would bring because the first one is likely to do

10  less harm.  Anytime there was discussion about pain

11  being inflicted upon the child in the car, your concern

12  was her calling the police.  Not her discomfort, her

13  calling the police.  That does not strike me as a person

14  who is a novice or who is engaging in role play.

15          The other comments by you that you have in the

16  past inflicted severe harm upon an 11-year-old by

17  beating her with a belt is corroborated by your comments

18  in the car with the undercover officer wherein you

19  stated -- you corrected the agent and said, no, it was

20  20 years ago and you went on to talk about how for 20

21  years you've been trying to find someone else, but it's

22  very difficult since a lot of people are fakers and they

23  don't follow through and that you were currently

24  negotiating sexual contact with a 17-year-old in some

25  other country.  You were very specific in your

1    description of beating this 11-year-old.

2         And while you now tell your psychiatrist that

3    that was fantasy, your appearance with all of the items

4    that you appeared with, your willingness to travel to

5    meet a complete stranger, your willingness to continue

6    forward after speaking to the child on the phone

7    indicates to me that it is a credible statement that you

8    had made in the past, so I reject the notion that this

9    is your first attempt at engaging in this sort of

10   behavior, and it defies common sense that a person who

11   has never engaged in this sort of behavior would fly to

12   a place where they have never been, where they know no

13   one and where they would meet somebody in order to have

14   sex with their child, which is a very dangerous

15   proposition to be sure.

16        On all counts, when I look at the nature of

17   the conduct you engaged in, the words that spring to my

18   mind are heinous, atrocious, unfathomable and

19   abominable.  I cannot imagine something more extreme

20   than trying to hurt a child for your own personal

21   pleasure.  And while you're certainly remorseful, that

22   is of little comfort to the victims that you intended to

23   inflict your harm upon, or the victim.

24        I have to be aware of the sentencing factors,

25   including the nature of the offense -- this is a

1    horrific offense, nothing short of horrific.

2         The punishment must reflect that offense

3    conduct.  It must deter you and others from engaging in

4    this sort of sex tourism, the sadistic sex tourism that

5    you were interested in participating in.  It must

6    protect the public from further harm.

7         And a point Ms. Rivera made is that sex

8    offenders of this type, of your type, who are here to

9    entice minors come in all ages.  I have sentenced men

10   who are considerably older than you.  I sentenced a man

11   who was 70.  I have sentenced men who were 65.  I am not

12   convinced at all that in ten years your propensity to

13   commit harm will be lessened.  The danger to the

14   community is just too severe to provide a mandatory

15   minimum sentence.

16        The guidelines in this type of case -- and

17   I've commented on this before -- are grossly out of

18   touch with the reality of the offense conduct.

19   Sometimes the Sentencing Guidelines are accurate.  I

20   think in sexual enticement of minors, they could not be

21   more wrong.  I could not follow the guidelines if I had

22   wanted to, and I certainly wouldn't if I could.

23        The government requests a sentence of 20 years

24   imprisonment.  I have imposed sentences of 20 years in

25   cases where the facts are far more less severe than

1    yours by a magnitude of many.

2            Mr. Kopp, I've considered the factors set

3    forth in 3553 and the Sentencing Guidelines and all of

4    the submissions the parties have given me, including

5    your acceptance of responsibility by pleading guilty,

6    and I'm prepared to sentence you at this time.

7            Mr. Kopp, please rise.  Having asked the

8    defendant why judgment should not now be pronounced and

9    having heard your response, after allowing the parties

10   to make statements in their own behalf, after reviewing

11   the presentence report and the advisory guidelines,

12   considering the factors set forth in 18 USC, Section

13   3551 and 3553, it's the judgment of the Court the

14   defendant, Meinrad Kopp, is committed to the custody of

15   the Bureau of Prisons to be imprisoned for a term of

16   life imprisonment.  You may be seated.  I have

17   additional comments.

18           In the event that you are ever released from

19   prison, which is highly unlikely, you will serve a term

20   of lifetime supervised release.  If you are ever on

21   supervised release, you will comply with the standard

22   conditions in the Middle District of Florida and the

23   following special conditions:

24           You will participate in a mental health

25   program specializing in sexual offender treatment and

1    submit to polygraph testing for the treatment and

2    monitoring purposes.  You will follow your probation

3    officer's instructions regarding the implementation of

4    this directive.  You will contribute to the cost of such

5    treatment and such polygraphs not to exceed an amount

6    determined reasonable by the Probation Office based on

7    your ability to pay or third party payment availability.

8              You are also required to register with the

9    state sexual offender registration agencies in any state

10   where you visit, reside, are employed or carry on a

11   vocation, including where you might be a student, as

12   directed by the Probation Office.

13             Your probation officer will provide state

14   officials with all information necessary under the

15   Florida sexual predator and sexual offender notification

16   and registration statutes and the Sex Offender

17   Registration Notification Act and may direct you to

18   report to these agencies for additional processing, such

19   as photographing, fingerprinting, and the collection of

20   DNA.

21             You will have no direct contact, should you

22   ever be released from prison, with minors -- that is,

23   people under the age of 18 -- without written approval

24   of the probation officer and will refrain from entering

25   any area where children may frequent, congregate -- that

1    is, frequently congregate, including schools, day care

2    centers, theme parks, and the like.

3              You may not possess, subscribe to or view any

4    images, video, magazines or literature or other

5    materials depicting children in the nude or in sexually

6    explicit positions.  Without prior written approval of

7    your probation officer you are prohibited from

8    possessing and using a computer, including a smartphone,

9    a hand-held computer device, a gaming console or an

10   electronic device capable of connecting to an online

11   service or an Internet service provider.

12             This prohibition includes a computer in a

13   public library, Internet cafe, your place of employment

14   or an educational facility.  You are prohibited from

15   possessing any electronic data storage medium, including

16   flash drives, compact discs, floppy disks and the like,

17   and you may not use encryption techniques or programs.

18             If you are allowed to possess or use such

19   devices by your probation officer, you must permit

20   routine inspection, including the hard drive and any

21   other electronic data storage medium to confirm

22   adherence to this condition.

23             The inspection or search will be conducted in

24   a manner no more intrusive than is necessary to ensure

25   compliance with the condition.  And if it may affect a

1    third party, including your employer, you must inform

2    them of this condition.

3            You must submit to a search of your person,

4    residence, place of business, any storage units under

5    your control, your computer or your vehicle, to be

6    conducted by the Probation Office at a reasonable time

7    in a reasonable manner based upon reasonable suspicion

8    of contraband or evidence of a violation of a condition

9    of release.

10           If you reside with anyone else you must advise

11   them that the premises may be subject to search pursuant

12   to this condition.  If you fail to allow a search, that

13   will be revocation -- or may result in revocation of

14   your supervised release.

15           You may not incur new credit card charges,

16   open additional lines of credit or obligate yourself for

17   any major purchases without the approval of the

18   Probation Office, and you will provide the Probation

19   Office access to any requested financial information.

20           You will cooperate in the collection of DNA,

21   having been convicted of a qualifying felony.

22           The mandatory drug testing requirements of the

23   Violent Crime Control Act are waived, but you will

24   submit to random drug testing not to exceed 104 tests

25   per year.

1              You will pay a fine in the amount of $250,000.

2              While in the Bureau of Prisons, you will pay

3    either $25 quarterly, if you have a non-UNICOR job or 50

4    percent of your monthly earnings, if you have a UNICOR

5    job.  Upon release from imprisonment, if you are

6    released, you will pay restitution in full within 60

7    days.  At any time during the course of post-release

8    supervision, the victim, the government or you may

9    notify me of a material change in your ability to pay,

10   and I may adjust the payment schedule accordingly.

11             Are there forfeiture matters to be considered

12   in this case, Ms. Rivera?

13             MS. RIVERA:  Yes, Your Honor.  There was a

14   preliminary order of forfeiture entered at docket 60,

15   and we are requesting that it be entered in the judgment

16   as well.

17             THE COURT:  It will be made final.

18             You will also pay the United States a special

19   assessment of $100, which is due immediately.

20             You will pay the United States a special

21   assessment of $5,000 under 18 USC, 3014, which is due

22   immediately.

23             After considering the advisory guidelines and

24   the factors set forth in 18 USC, 3553(a)(1) through (7),

25   I find the sentence that I have imposed is sufficient,

1    but not greater than necessary to comply with the

2    statutory purposes of sentencing.

3              You are remanded to the custody of the United

4    States Marshals to await designation by the Bureau of

5    Prisons.  I will not recommend Butner.  I will allow the

6    authorities there to decide where you will best serve

7    your sentence.

8              I have accepted your plea agreement, because

9    I am satisfied it adequately reflects the seriousness

10   of your conduct, and accepting the agreement does not

11   undermine the statutory purposes of sentencing.  As a

12   result, I will dismiss Counts 2 and 3 of the indictment.

13             Having pronounced sentence, does counsel for

14   the defendant or the government have objection to the

15   sentence or the manner in which it's been pronounced?

16             MS. RIVERA:  Your Honor, we would just like

17   to clarify.  Regarding the -- the Court made a comment

18   regarding restitution, but we're not seeking restitution

19   at this point.  I believe it was a fine --

20             THE COURT:  Well, there's restitution for

21   victims, but there's a $5,000 mandatory statement.

22             Do you believe that's not applicable?

23             MS. RIVERA:  Oh, no.  The $5,000 assessment

24   is definitely applicable.

25             THE COURT:  That's the only restitution I was

1   referring to.

2           MS. RIVERA:  Oh.  Thank you, Your Honor.

3           MR. PARWARESCH:  Your Honor --

4           THE COURT:  Any objection -- pardon me, I'm

5   sorry.  Ms. Rivera, any objection to the sentence?

6           MS. RIVERA:  No, Your Honor.

7           THE COURT:  And the defense.

8           MR. PARWARESCH:  Thank you, Your Honor.

9           Would the Court please note my objection on

10  substantive and procedural grounds, as well as a

11  violation of the Eighth Amendment.

12          THE COURT:  I will.

13          MR. PARWARESCH:  Thank you, Your Honor.

14          THE COURT:  Absolutely.

15          Mr. Kopp, you are entitled to appeal from this

16  sentence within 14 days from today's date.  If you fail

17  to appeal in 14 days, there is a waiver of your right to

18  appeal.  The government may appeal the sentence as well.

19  You are entitled to the assistance of counsel in taking

20  an appeal.  And if you cannot afford an attorney, one

21  will be provided for you.  If you cannot afford the

22  filing fee, the clerk of court will take your notice of

23  appeal without payment of that fee.  Thank you, ladies

24  and gentlemen.  That concludes this proceeding.

25          (Adjourned at 4:08 p.m.)

1                    - - - - - - - - -

2               Certificate of Official Reporter

3    I hereby certify that the foregoing is a correct

4    transcript of the stenographically reported

5    proceeding held in the above-entitled matter.

6
     s/Koretta Stanford
7    Official Court Reporter
     United States District Court
8    Middle District of Florida       Date:  1/30/18

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25